1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   NETTIE REAY,

11            Petitioner,                    No. CIV S-05-0356 GEB DAD P

12        vs.

13   GLORIA HENRY, Warden,

14            Respondents.              <u>FINDINGS AND RECOMMENDATIONS</u>

15   _____/

16            Petitioner is a state prisoner proceeding pro se with an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction for

18   second degree murder entered against her on October 14, 1998, in the Sacramento County

19   Superior Court.  She seeks relief on the grounds that: (1) the state courts' retroactive application

20   of the decision in <u>People v. Anderson</u>, 28 Cal. 4th 767 (2002) to her appeal violated her right to

21   due process; (2) her due process rights to present a defense and to a fair trial were violated when

22   the state courts failed to grant her a new trial at which she could take advantage of the decision in

23   <u>Anderson</u>; (3) her right to due process was violated when the trial court failed to instruct the jury

24   in her case on mistake of fact; and (4) her statements to police should have been excluded from

25   evidence at her trial because they were obtained in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436

26   /////

                                          1

(1966) and were coerced. Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

PROCEDURAL AND FACTUAL BACKGROUND[1]

Petitioner was convicted of the second degree murder of Angel Dixon following a jury trial. (Reporter's Transcript on Appeal, lodged in Travis Reay Habeas, Case No. CIV S-02-2067 GEB DAD P (hereinafter RT), at 1479.) Petitioner's husband and co-defendant, Travis Reay, was convicted of first degree murder in the death of Angel Dixon. (Id. at 1482.) On October 14, 1998, petitioner was sentenced to 16 years to life in state prison. (Pet. at consecutive p. 1.) Petitioner filed a timely appeal in the California Court of Appeal for the Third Appellate District. (Lodged Doc. 23 filed in Travis Reay Habeas, Case No. Civ. S-02-2067 GEB DAD P). The appellate court reversed petitioner's judgment of conviction, finding that there was jury instruction error at her trial. (Opinion at 1.)

Respondent filed a timely petition for review in the California Supreme Court. (Lodged Doc. 25, filed July 5, 2005.) The California Supreme Court granted respondent's petition and transferred review of the matter to the Court of Appeal with directions to vacate its prior decision and reconsider the case in light of the then-recently decided People v. Anderson, 28 Cal. 4th 767 (2002). (Lodged Doc. 7 filed in Travis Reay Habeas, Case No. Civ. S-02-2067 GEB DAD P). Upon review, the California Court of Appeal vacated its prior decision, determined that the decision in Anderson was retroactive, and upheld petitioner's judgment of conviction. (Opinion at 2.) In its opinion, the state appellate court described the facts underlying petitioner's conviction as follows:

---

[1] The following summary is drawn from the August 21, 2003 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), designated as Lodged Document 10 in the habeas corpus action filed by petitioner's co-defendant Travis Reay, Case No. CIV S-02-2067 GEB DAD P (hereinafter Travis Reay Habeas). This court presumes that the state court's findings of fact are correct unless petitioner rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004). Petitioner has not attempted to overcome the presumption with respect to the underlying events. The court will therefore rely on the state court's recitation of the facts.

We revisit in part the appeals of defendants Travis Reay and Nettie Reay (Travis and Nettie or collectively defendants) on remand from the California Supreme Court.

In a prior unpublished decision, we reversed the judgment against Nettie because the trial court refused to give an instruction on duress for lack of evidence to support the defense, and affirmed as modified the judgment against Travis. The People petitioned the Supreme Court for review of this issue, which was granted. A separate petition by Travis was denied.

The Supreme Court has directed us to "vacate [our] decision and to reconsider the cause in light of People v. Anderson (2002) 28 Cal.4th 767" (hereafter Anderson), which held inter alia that duress is not a defense to the crime of murder under Penal Code section 26.[2]

Having done so, we determine that Anderson is retroactive. Accordingly, we shall affirm the judgment of conviction as to Nettie except to modify her restitution fine. We shall also affirm the judgment of conviction of Travis with a modification as to restitution.

## FACTUAL BACKGROUND

On Monday, August 16, 1993, at 1 p.m., law enforcement officers found Angel Dixon, dead, in a field near the Sacramento Airport. She had been stabbed more than 50 times, five of the wounds caused her death, one to the neck and two to each lung. It was determined that she had probably died more than a day earlier; she might have been killed as early as on the previous Sunday morning.

About three and one-half years later, the Sheriff's Department received a telephone call from a person who asserted the defendants were responsible for the killing. On October 16, 1996, deputy sheriffs interviewed Nettie. She implicated Scott DeGraff. She and DeGraff, who was granted use immunity for his testimony, testified at trial.

DeGraff testified to the following account of the killing. He was visiting Travis's house; Nettie was also there. Angel Dixon arrived. As DeGraff came back from the bathroom she left. Travis told DeGraff to follow her and tell her that "they were only kidding" and to ask her to return. He did so. When she returned with DeGraff, one of the defendants locked the door.

The defendants, yelling, confronted Dixon about "itching her arm" (apparently an idiom for using drugs) in the presence of Travis's

---

[2] All further section references are to the Penal Code unless otherwise specified.

nephew. Dixon attempted to leave. Nettie struck Dixon, causing her to fall to the floor and then hit her in the nose. Travis left the room, returned with handcuffs, and, with Nettie's assistance, cuffed Dixon's hands behind her back. On cross-examination DeGraff conceded that his account in a statement to the police that Nettie continued to hit Dixon for a few minutes was more accurate. He said he thought Dixon's nose was broken and that she bled profusely.

Travis asserted he was afraid that Dixon would retaliate against his family or his dog through Dixon's association with a motorcycle gang. He informed DeGraff that he needed to leave the area to avert retaliation. The defendants took Dixon to DeGraff's car and, following directions from Travis, DeGraff drove to the place where Dixon's body was found.

The defendants took Dixon out of the car. Nettie struck Dixon several times. In direct examination, DeGraff said the defendants, holding Dixon's arms, pulled her along into the field to an area of bushes. On cross-examination, impeached with a statement to police officers, DeGraff said Travis pulled Dixon into the field. On re-direct examination DeGraff went back to his account of Nettie also pulling Dixon. DeGraff stayed by the car. Travis threw Dixon to the ground and got on top of her. DeGraff saw him making striking motions with an object as Nettie held Dixon down.

Eventually, the defendants returned to the car. DeGraff saw movement in the brush where Dixon was. Dixon got up and ran toward the car. Nettie said: "I don't think she's dead." Dixon, bloodied, reached the car and beseeched DeGraff to help her. He pushed her away, saying he did not "want anything to do with it." On direct examination DeGraff testified that the defendants grabbed Dixon and dragged her back further into the bushes. On cross-examination DeGraff said he looked away. On redirect examination he agreed with his statement to the police that on the second occasion, Nettie pushed Dixon to the ground.

On direct examination DeGraff testified that at some point during the first or second assault in the bushes Travis asked Nettie to help because his knife was stuck. Nettie kneeled or stepped on Dixon's back and Travis pulled the knife out. On cross-examination DeGraff testified that he did not see Nettie stand on Dixon, that he saw Travis put his foot on Dixon's back during the second assault in the bushes, and that after he returned to the car Travis said the knife had gotten stuck in Dixon.

Eventually the defendants returned to DeGraff's car and he drove to a liquor store in their neighborhood. Travis said he had to get rid of the knife and he put it in a garbage can. DeGraff then drove them to the house of a relative of Nettie. They went into the house for a short time, then they went to a smaller detached residence in

4

the backyard. Nettie told DeGraff where a hose was located and he washed the blood off of the car. DeGraff then left with his car and did not see either defendant for a couple of months.

On cross-examination DeGraff testified that after the killing they had first gone to the house of Travis Reay's mother. DeGraff said that Travis's mother had acted hysterical and Travis had struck her. After they arrived at the second house, Nettie was upset and asking Travis, "why did you do it?" He was angered and struck her in the nose and in the stomach, causing her to drop to her knees, gasping.

Nettie testified at trial. Her account of the killing differs from that of DeGraff as to some details. She assaulted Dixon at Travis's house because he told her to "whip her ass." She went to DeGraff's car because she was told to do so. When they arrived at the field Travis removed the handcuffs from Dixon and told her she had 10 seconds to run. Dixon ran off and Travis ran after her. Dixon went down out in the field and Travis was on top of her, hitting her. After about five minutes he told Nettie to come to him. She went and saw Dixon lying "full of blood." Travis had two knives. He handed one to her and told her to "stick" Dixon. She did so three or four times, once in the stomach, the others in the legs. She did not think Dixon was alive.

When she walked back to the car Dixon got up and started to run. Travis ran after Dixon and stabbed her again. She did not "remember" Dixon coming to the car as Degraff had testified. When Travis came back to the car he said the knife was stuck and he could not get it out.

The first place they went after the killing was to Nettie's mother's house. They washed the car off and then walked to her cousin's house. She gave the handcuffs to her cousin to dispose of, but Travis asked what she was doing and she took them back. They walked to a donut shop to meet Travis's mother. In the parking lot Nettie became emotional and Travis struck her. They went to his house and she went straight to the bedroom.

Nettie Reay also testified on direct examination that the reason she beat Dixon and later stabbed her was because she was afraid of disobeying Travis's directions. She believed that if she did not beat Dixon she would be beaten and that if she did not stab Dixon she also would be laying in that field. She testified that her father abused her mother. She testified that since about 13 she had cohabited with a man who beat her regularly and severely until the relationship ended in October 1992. She met Travis in January 1993 and commenced a relationship with him. He soon began to slap her and push her around and on one occasion before the killing beat her severely. He hit her two, three, sometimes four times a month. (Seven or eight months after killing Dixon they married.) He beat her up in front of his mother, who attended the trial.

On cross-examination Nettie was impeached with statements that she had given law enforcement officers. She denied she told them she had chased Dixon after the first stabbing episode and stabbed her again. She conceded the officers asked if she had been forced to participate and she did not indicate she had been. She conceded she had beaten Dixon in part because she was angry about her drug use in the presence of Travis's nephew. She admitted saying she wanted to accompany Travis to make sure he did not engage in sexual conduct with Dixon. If he had tried that she would have told him no. She conceded she told the detectives she did not know why she stabbed Dixon and that she agreed with their statement: "You just did it because you wanted to be part of the group[.]"

Charlotte Scharp, DeGraff's fiancé, testified that in the spring of 1993, after she had stopped dating Travis, he invited her to his house. When she arrived he handcuffed her hands behind her back and Travis and another man abused her, squirting water on her, pushing her from one to the other, and smacking and kicking her.

Linda Arnell, Nettie's mother, testified she was awakened in the middle of the night in August 1993 by her daughter, who told her she needed to park DeGraff's car in her garage because it had blood on it or in it. Nettie said DeGraff and Travis were with her. Arnell denied the request but said she could use the hose to wash the car off.

Connie Teeters, Nettie's cousin, testified that in mid-August 1993, when she was 14 years old and living near Arnell's house, Nettie made a noise at her window one night between midnight and 3 a.m. Teeters went to the window and saw Travis and Nettie, alone. Nettie said: "we just killed somebody." She handed Teeters a pair of handcuffs and said to hide them or throw them away. Teeters threw them in her trash can. At this point Travis said: "What are you doing?" Nettie told Teeters to return the handcuffs. She did so.

Connie Teeters's mother, Nettie's aunt, Doris Teeters, testified that the day before the discovery of Dixon's body was announced on the evening news, her niece told her of the killing. Her account of the conversation is consistent with the broad outline of Nettie's trial testimony. Doris Teeters said that Nettie asked her if Connie Teeters talked to her about seeing her the night before.

Nettie adduced the opinion testimony of two expert witnesses concerning the battered women's syndrome. Dr. Linda Barnard, a licensed marriage and family child counselor, opined that Nettie suffered from this syndrome at the time of the Dixon killing. A woman in this condition believes there is no escape and copes by choosing submissive behaviors. Symptoms include depression,

flashbacks, startled response, and hypervigilance. Nettie demonstrated these typical symptoms.

She testified that Nettie does not cope with domestic violence well, "she just goes downhill pretty quickly into depression and into compliance." She is prone to enter a disassociative state, in which the psyche protects itself from trauma by emotional numbness: "she finally just sort of gave up and just didn't feel."

Dr. Barnard testified that Nettie only told her of two specific instances of battery by Travis before the killing, one in February and one in March 1993. However, as a rule she does not ask about every instance of battery when doing an interview.

Dr. Phyllis Kaufman, a licensed clinical psychologist and social worker, opined that Nettie suffers from post-traumatic stress disorder, consistent with the battered women's syndrome, as a result of witnessing domestic violence as a child and being battered from age 13 on. Emotional stress impairs her judgment and an excess of stress causes a disassociative state in which she is not able to make effective judgments and she becomes impulsive and confused. When she cannot cope with stress she suffers loss of cognitive control: "Loss of intellectual ability to understand what she is doing, that ability to look at one's self and be in control of one's behavior. She loses that. She does not know what she is doing. She becomes a robot and takes orders from others."

Travis did not testify, nor did he call his mother as a witness. He called Stephanie Schaefer, who testified that she was at his house from 6 or 7 p.m. on the night of August 15, 1993. Schaefer said that Nettie was there when she arrived but left an hour later. Schaefer spent the night, sleeping on the living room sofa, and Travis did not leave his house that night. Schaefer's account of the evening of August 15, 1993, was corroborated by testimony of David Coe, who also said he spent that night in the living room.

(Id. at 1-10.)

After her conviction was affirmed by the state appellate court, on September 23, 2003, petitioner filed a timely petition for review in the California Supreme Court. (Lodged Doc. 30.) That petition was summarily denied by order dated November 25, 2003. (Lodged Doc. 31.)

ANALYSIS

I. Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860,

861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).  If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008).  See also Frantz v. Hazey, 513 F.3d 1002, 1013 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

/////

The court looks to the last reasoned state court decision as the basis for the state court judgment. <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. <u>Edwards v. Lamarque</u>, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003); <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002); <u>Delgado v. Lewis</u>, 223 F.3d 976, 982 (9th Cir. 2000). When it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's deferential standard does not apply and a federal habeas court must review the claim de novo. <u>Nulph v. Cook</u>, 333 F.3d 1052, 1056 (9th Cir. 2003).

II. <u>Petitioner's Claims</u>

    A. <u>Retroactive Application of People v. Anderson</u>

Petitioner's first claim is that the California Court of Appeal violated her right to due process in holding that the decision of the California Supreme Court in <u>People v. Anderson</u> was retroactive and applicable to her appeal. She contends that "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." (Attachment to Pet. at 4.) Petitioner argues that "the Supreme Court's decision was an unexpected and sharp departure from existing law, and at odds with the plain language of the relevant statute, thus denying the due process right to 'fair warning . . . of what the law intends to do if a certain line is passed.'" (<u>Id.</u>)

In her brief filed in the California Court of Appeal after the remand from the California Supreme Court, petitioner argued that <u>Anderson</u> could not be applied retroactively to

/////

her case without violating her state and federal right to due process. (Lodged Document 29 at 5-6.) The California Court of Appeal rejected this argument, reasoning as follows:

> Nettie was charged with murder and convicted by jury of murder in the second degree. On appeal to this court, she contended the trial court committed reversible error by failing to give her requested instructions on the defense of duress. The trial court reasoned there was legally insufficient evidence of immediacy to warrant a duress instruction.
>
> In a prior unpublished decision, we agreed with Nettie, finding there was sufficient evidence to warrant giving the instruction and reversed the judgment.[3] The People petitioned for review of that decision and the Supreme Court directed us to vacate our decision and reconsider the cause in light of Anderson, supra, 28 Cal.4th 767. We do so.
>
> In Anderson, the California Supreme Court held the defense of duress under section 26, subdivision Six, is not a defense to the crime of murder and therefore declined to decide whether the evidence in that case would have warranted duress instructions. (28 Cal.4th at p. 785.)
>
> An appellate court reviews the trial court's result, not its reasons. (Triple A. Management Co. v. Frisone (1999) 69 Cal.App .4th 520, 535.) In light of the holding in Anderson, we conclude the trial court did not err by failing to give the requested instruction on duress.
>
> 2. Retroactivity of Anderson
>
> In a supplemental brief filed on remand, Nettie contends that Anderson, supra, may not be applied retroactively without violating her due process protections under the United States and California Constitutions. The People contend this court may follow the instructions of the California Supreme Court to reconsider its decision in light of Anderson without violating due process protections because Anderson did not change a settled rule on which the parties below relied. We agree with the People.
>
> Under basic principles of due process, a criminal statute must give "fair warning" of the conduct it makes criminal. (Bouie v. Columbia (1964) 378 U.S. 347, 350 [12 L.Ed.2d 894, 898].) The right of fair warning may be violated as much by vague statutory language as by the retroactive application of "an unforeseeable judicial enlargement of a criminal statute ...." (Id. at p. 352-353

---

[3] The legal question decided in Anderson was not raised by the parties nor addressed by this court in our unpublished opinion.

[12 L.Ed.2d at p. 899]; Rogers v. Tennessee (2001) 532 U .S. 451, 459-460 [149 L.Ed.2d 697, 706].)  Thus, while judicial decisions are generally given retroactive effect (Smith v. Rae-Venter Law Group (2002) 29 Cal.4th 345, 372; Newman v. Emerson Radio Corp. (1989) 48 Cal.3d 973, 978), "[i]f a judicial construction of a criminal statute is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue,' it must not be given retroactive effect." (Bouie v. Columbia, supra, 378 U.S. at p. 354 [12 L.Ed.2d at p. 900], quoting Hall, General Principles of Criminal Law (2d ed.1960) p. 61; Rogers v. Tennessee, supra, 532 U.S. at p. 462 [149 L.Ed.2d at p. 708].)

Although a judicial gloss may provide the requisite level of clarity on an otherwise uncertain statute, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope...." (United States v. Lanier (1997) 520 U.S. 259, 266 [137 L.Ed.2d 432, 442-443].)  "[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." (Id. at p. 267 [137 L.Ed.2d at p. 443].)

In holding that the defense of duress under section 26, subdivision Six does not apply to the crime of murder, the court in Anderson reviewed the history of that defense both at common law and under section 26.[4]  The defendant had argued that the qualifying phrases "unless the crime be punishable with death" did not apply because his offense was not so punishable.  Accordingly, he could assert a duress defense.  The court disagreed saying that "[t]he exception for a crime punishable with death refers to a crime punishable with death as of 1850" when all homicide was punishable with death. (28 Cal.4th at p. 774.)

The court explained that section 26 codified the common law and "[a]t common law, the general rule was, and still is today, what Blackstone stated: duress is no defense to killing an innocent

---

[4]  Section 26 provides in pertinent part:

"All persons are capable of committing crimes except those belonging to the following classes:

".........................

"Six-Persons (unless the crime be punishable with death) who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused."

11

person. 'Stemming from antiquity, the nearly "unbroken tradition" of Anglo-American common law is that duress never excuses murder, that the person threatened with his own demise "ought rather to die himself, than escape by the murder of an innocent."' [Citations.]" (Anderson, supra, 28 Cal.4th at p. 772, fn. omitted.)

The court traced the legislative history of the defense of duress under section 26 back to 1850 when all murder was punishable by death. (See Stats. 1850, ch. 99, § 21, p. 231.) Finding the relevant California case law construing section 26 "sparse" and "inconclusive,"[5] the court concluded that "like many of California's early penal statutes [citations], section 26 effectively adopted the common law, although the Legislature used a problematic method in which to do so." (Id. at pp. 774.) While impliedly acknowledging that section 26 is ambiguous, the court declined to apply the rule of lenity (see People v. Avery (2002) 27 Cal.4th 49, 57-58), which "compels courts to resolve true statutory ambiguities in defendant's favor," because it found "the possible interpretations of section 26 do not stand in relative equipoise." (28 Cal.4th at p. 780.)[6] The court also found important that when section 26 was amended in 1976 and 1981,[7] "there was no long-standing and consistent judicial interpretation that duress was a defense to some but not all murder, only fleeting dicta in a single intermediate

---

[5] In concluding the relevant California case law is sparse and inconclusive, the Court looked to the decisions in People v. Martin (1910) 13 Cal.App. 96, 102; People v. Petro (1936) 13 Cal.App.2d 245, 247-248; People v. Moran (1974) 39 Cal.App.3d 398, 417; People v. Son (2000) 79 Cal.App.4th 224, 232-233; and Tapia v. Roe (9th Cir.1999) 189 F.3d 1052, 1057. (Anderson, supra, 28 Cal.4th. at p. 773.)

[6] Under the court's construction of section 26, the phrase "unless the crime be punishable with death" is interpreted by the addition of a modifying clause to mean "a crime punishable with death as of 1850 . . . ." (28 Cal.4th at p. 774.) In 1850, there was only one form of murder and "[t]he punishment of any person convicted of the crime of murder shall be death." (Stats.1850, ch. 99, § 21.) Hence, in 1850, the defense of duress, which applied only to "a crime not punishable with death," did not apply to murder. (Stats.1850, ch. 99, § 10.) Beginning in 1857, however, murder was divided into degrees, and only first degree murder was punishable with death. (Stats.1856, ch. 139, § 2, p. 219.) With this change in the law of murder, the application of the defense of duress became problematic. That problem remains under the current law of murder. As Justice Kennard reasoned in her concurring and dissenting opinion in Anderson, the statute defining duress could also be interpreted as inapplicable only to the form of murder punishable with death. (28 Cal.4th at pp. 786-787.) Anderson resolved this perceived ambiguity in the statute's application by reading into section 26 a limitation not expressed in the statutory language, i.e. "as of 1850."

[7] The amendments deleted two classes of persons from the provisions of section 26 that the original statute had made incapable of committing crimes. (Stats.1976, ch. 1181, § 1, p. 5285 [married women acting under threats by their husbands]; Stats.1981, ch. 404, § 3, p. 1592 [lunatics and insane persons].)

appellate court decision that duress was a defense to all murder when there was no death penalty." (28 Cal.4th at p. 780.)

In short, prior to Anderson, there was no firmly established rule holding duress applicable only to certain forms of murder. To the contrary, as the court in People v. Pena (1983) 149 Cal.App.3d Supp. 14, understood the law , "it appears settled that the duress defense is available to a defendant charged with any crime except one which involves the taking of the life of an innocent person." (Id. at p. 22, orig. emph.; see also People v. Martin, supra, 13 Cal.App. at p. 102 [citing section 26 and Blackstone, the court stated "[i]t has ever been the rule that necessity is no excuse for killing an innocent person."].) Likewise, referencing section 26, Witkin states: "The defense of coercion is generally held unavailable where the crime is homicide; i.e., the threat even of death to oneself does not excuse the killing of another innocent person." (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Defenses, § 54, p. 390.)

While five cases mention the defense of duress under section 26, none of those cases address and resolve the legal question resolved in Anderson, i.e. whether duress is an available defense to noncapital murder. (See People v. Martin, supra, 13 Cal.App. at p. 102; People v. Petro, supra, 13 Cal.App.2d at pp. 247-248; People v. Moran, supra, 39 Cal.App.3d at p. 417; People v. Son, supra, 79 Cal.App.4th at pp. 232-233; Tapia v. Roe, supra, 189 F.3d at p. 417; see also People v. Beardslee (1991) 53 Cal.3d 68, 85-86.)

The retroactive application of a judicial construction is not barred merely because the law is ambiguous and uncertain. (People v. Poggi (1988) 45 Cal.3d 306, 327 (Poggi ).) In Carlos v. Superior Court (1983) 35 Cal.3d 131 ( Carlos ), the court construed section 190.2 to require an intent to kill or to aid a killing, when the statute did not specify that requirement and was therefore uncertain and ambiguous. (Id. at pp. 135, 147; see also Poggi, supra, at p. 327.) People v. Anderson (1987) 43 Cal.3d 1104 overruled Carlos in part, holding that with respect to the actual killer, the court need not instruct on intent to kill in connection with the felony-murder special circumstance. (Id. at pp. 1138-1139.) In Poggi, the court held Anderson could be applied retroactively, reasoning that "[n]o such unforseeeability existed here. Defendant stands convicted of a murder that preceded Carlos. Carlos itself concluded that the statute was ambiguous with respect to the requirement of intent to kill for a felony-murder special circumstance. [Citation.] There was ample basis for pre-Carlos forseeability of a holding that such intent is not required for the actual killer. [Citation.]" (Id. at p. 327.)

Therefore, even though the language of section 26 is ambiguous, retroactive application of Anderson, supra, 28 Cal.4th 767, is not foreclosed. Neither the case law nor the legislative history severed

section 26 from its common law roots. Because those roots established an unbroken tradition that duress is not a defense to the killing of an innocent person, the decision in <u>Anderson</u> construing section 26, consistent with those roots, was neither novel nor unforeseeable. Accordingly, we find <u>Anderson</u> may be applied retroactively to defendant.

(Opinion at 10-17.)

The United States Constitution provides that "No State shall . . . pass any . . . ex post facto Law." U.S. Const. art. I, § 10. <u>See also</u> <u>Himes v. Thompson</u>, 336 F.3d 848, 854 (9th Cir. 2003). A law violates the Ex Post Facto Clause of the United States Constitution if it: (1) punishes as criminal an act that was not criminal when it was committed; (2) makes a crime's punishment greater than when the crime was committed; or (3) deprives a person of a defense available at the time the crime was committed. <u>See</u> <u>Collins v. Youngblood</u>, 497 U.S. 37, 52 (1990). The Ex Post Facto Clause "is aimed at laws that retroactively alter the definition of crimes or increase the punishment for criminal acts." <u>Himes</u>, 336 F.3d at 854 (quoting <u>Souch v. Schaivo</u>, 289 F.3d 616, 620 (9th Cir. 2002)). <u>See also</u> <u>Cal. Dep't of Corr. v. Morales</u>, 514 U.S. 499, 504 (1995). "An unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law." <u>Bouie v. City of Columbia</u>, 378 U.S. 347, 353 (1964). Therefore, "[i]f a judicial construction of a criminal statute is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue,' it must not be given retroactive effect." <u>Id.</u> at 353-54 (quoting Hall, <u>General Principles of Criminal Law</u> (2d ed. 1960), at 61.) When an unforeseeable state-court construction of a criminal statute is applied retroactively to subject a person to criminal liability for past conduct, "the effect is to deprive him of due process of law in the sense of fair warning that his contemplated conduct constitutes a crime." <u>Id.</u> at 354-55. <u>See also</u> <u>Marks v. United States</u>, 430 U.S. 188, 191 (1977) ("persons have a [due process] right to fair warning of that conduct which will give rise to criminal penalties").

/////

14

The state appellate court's decision correctly identified the relevant federal law and reasonably applied it to the facts of this case. As explained by the California Court of Appeal, state law gave petitioner fair notice that the defense of duress was not available to a criminal defendant charged with murder. Accordingly, the retroactive application of the decision in Anderson to her case was not "unexpected" or "unforeseeable." Petitioner's right to due process was not violated by the state court's retroactive application of a California Supreme Court's decision which merely confirmed previous holdings that the duress defense was not available to a murder charge. See, e.g., Hughes v. Borg, 898 F.2d 695, 705 (9th Cir. 1990) (retroactive application of state court decision did not violate the petitioner's due process rights because prior law provided fair warning of the possible result). Cf. Bouie, 378 U.S. at 356 (due process violation where interpretation given to a state statute by the South Carolina Supreme Court was "clearly at variance with the statutory language" and had "not the slightest support in prior South Carolina decisions"); Rabe v. Washington, 405 U.S. 313, 315-16 (1972) (state obscenity law reversed because it rested on an unforeseeable judicial construction of the statute). Because the decision of the California Court of Appeal was not contrary to or an unreasonable application of federal law, petitioner is not entitled to relief on this claim.

B. Denial of Due Process and the Right to Present a Defense

In her second claim, petitioner alleges that her right to due process and her right to present a defense were violated because she was not granted a new trial at which she could take advantage of the ruling in Anderson. She contends that "even if duress was not a complete defense to the charges against her, petitioner was entitled to a requested instruction on the relationship between duress, Battered Women's Syndrome evidence and proof of the mental state of second degree murder." (Attachment to Pet at 4.)

This claim was presented to the California Court of Appeal in petitioner's brief following remand from the California Supreme Court. (Lodged Doc. 29 at 18-21.) The state appellate court also rejected this claim, reasoning as follows:

On remand, Nettie contends that if we conclude <u>Anderson</u> operates retroactively, she is entitled to a new trial because she did not receive the benefit of the ruling in <u>Anderson</u>. She argues she is entitled to instructions relating duress and the Battered Women's Syndrome (BWS) to the conscious disregard element of implied malice, a mental state of second degree murder. The People contend the jury was properly instructed on BWS and the requisite mental states of murder. We agree with the People.

Contrary to Nettie's claim, <u>Anderson</u> did not hold that duress is relevant to disprove implied malice murder. Rather, it noted "the circumstances of duress would certainly be relevant to whether the evidence establishes the elements of implied malice murder. The reasons a person acted in a certain way, including threats of death, are highly relevant to whether the person acted with a conscious or wanton disregard for human life. [Citation.] This is not due to a special doctrine of duress but to the requirements of implied malice murder." (<u>Anderson</u>, <u>supra</u>, 28 Cal.4th at pp. 779-780; <u>see also</u> <u>People v. Beardslee</u>, <u>supra</u>, 53 Cal.3d at pp. 85-86.)

The jury was properly instructed under <u>Anderson</u> on the definition of murder (CALJIC No. 8.10), unpremeditated second degree murder (CALJIC No. 8.30), implied malice second degree murder (CALJIC No. 8.31), and the mental states of murder, including express and implied malice aforethought. (CALJIC No. 8.11).[8] Additionally, the jury was instructed that "[t]he specific intent or mental state with which an act is done may be shown by the circumstances surrounding the commission of the act" ( CALJIC No. 2.02), and that evidence of BWS, if believed, may be considered to determine whether or not Nettie formed the mental state necessary for murder.[9]

In closing argument, defense counsel argued that the circumstances of the murder, considered in connection with the defense experts' testimony regarding Nettie's mental state, showed she was not guilty of murder because she did not premeditate, deliberate, or harbor malice. He told the jury the experts' testimony showed that when the killing occurred, Nettie was in a psychotic disassociative

---

[8] This instruction defined the mental state of implied malice as a "killing result[ing] from an intentional act; the natural consequences of the act are dangerous to human life; and the act was deliberately performed with knowledge of the danger to and with conscious disregard for human life."

[9] The jury was instructed that "Evidence, including expert testimony, of Battered Women's Syndrome, has been introduced in this case. Such evidence, if believed, may be considered by you for the purpose of determining whether or not the defendant, Nettie Reay, formed the mental state necessary for murder. Such evidence if believed, may be considered by you in considering the credibility of defendant Nettie Reay."

16

state because she suffered from post-traumatic stress disorder and BWS resulting from physical abuse by Travis and by earlier abuse by other men. Counsel reminded the jury of Nettie's fear of Travis, her belief he would kill her if she did not do as she was told, her hysteria immediately after the murder, her consistent statements that she stabbed the victim three or four times to appease Travis because he handed her the knife and ordered her to "stick" the victim, her belief that the victim was dead at the time she stabbed the victim, and that she only inflicted superficial nonfatal wounds. Counsel also tied the BWS evidence to defendant's submissive behavior at the time of the crime and at the time she was questioned by officers.

Thus, under the instructions given and counsel's argument, the jury was adequately informed it could consider the evidence of BWS and Nettie's fear of Travis as circumstances relevant to whether she acted with a conscious or wanton disregard for human life. Anderson allows no more. (28 Cal.4th at p. 780.)

Nettie further contends that if defense counsel had known the Supreme Court would preclude the use of duress as a complete defense to murder, he would have tried the case differently, focusing on the effect of Travis's threats on Nettie's state of mind. We disagree primarily because the record reflects that counsel tried the case on that very theory, to show the effect of Travis's threats on Nettie's state of mind. Anderson did not change the law governing the effect of threats on the issue of malice. Well before Anderson, the California Supreme Court in People v. Beardslee, supra, 53 Cal.3d 68, approved of instructions authorizing the jury to consider the effect of death threats on the mental states for first and second degree murder. (Id. at pp. 85-86.) So Anderson broke no new ground in that regard. Counsel had Beardslee as a guidepost and followed it. As Nettie states in her supplemental brief, "[i]t was never argued nor was it intended that the defense would argue to the jury that because Travis had beaten Nettie she should not be found guilty of murder. The defense theory was much more complex, and the Battered Women's Syndrome evidence was only presented to explain her conduct in the context of other defenses which are available to all criminal defendants." Thus, defendant concedes she did not present evidence of duress as a complete defense to murder. Rather, as previously discussed and as summarized in her supplemental brief, counsel presented evidence to establish that the "circumstances of duress" affected Nettie's mental state. Accordingly, because counsel tried the case consistent with Anderson and Beardslee, we conclude there was no instructional error and Nettie was not deprived of the benefit of her defense theory.

(Opinion at 17-21.)

/////

17

Petitioner argues that her trial was rendered fundamentally unfair because the jury was not adequately instructed on how Battered Wife Syndrome and duress affect implied malice. However, a challenge to jury instructions does not generally state a federal constitutional claim. See Middleton v. Cupp, 768 F.2d at 1085 (citing Engle v. Isaac, 456 U.S. at 119); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). Habeas corpus is unavailable for alleged error in the interpretation or application of state law. Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986). Of course, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 672 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)). See also Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (To prevail on such a claim petitioner must demonstrate that an erroneous instruction "so infected the entire trial that the resulting conviction violates due process.")

The analysis for determining whether a trial is "so infected with unfairness" as to rise to the level of a due process violation is similar to the analysis used in determining, under Brecht, 507 U.S. at 623, whether an error had "a substantial and injurious effect" on the outcome. See Polk v. Sandoval, 503 F.3d 903, 911 (9th Cir. 2007) (standard applied to habeas petition presenting a jury instruction challenge); McKinney v. Rees, 993 F.2d 1378, 1385 (9th Cir. 1993). In making its determination, this court must evaluate the challenged jury instructions "in the context of the overall charge to the jury as a component of the entire trial process." Prantil, 843 F.2d at 317 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)). Where, as here, the challenge is to a failure to give an instruction, petitioner's burden is "especially heavy," because "[a]n omission, or an incomplete instruction is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977). See also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).

The California Court of Appeal concluded that petitioner's jury was adequately instructed on the requisite mental state for a conviction on a murder charge, and on how evidence of Battered Women's Syndrome should be considered when determining whether or not petitioner formed the required mental state necessary for conviction on the charge of murder. The state court's conclusion in this regard is not unreasonable. The jury instructions given at petitioner's trial were adequate to inform the jury that it could consider petitioner's fear of her husband and her prior history of abuse in determining whether she acted with implied malice. As discussed by the California Court of Appeal, petitioner's counsel explained how these jury instructions were consistent with the theory of the defense during his closing argument.

The state appellate court also concluded that petitioner was able to present to the jury her defense that she lacked the mental state required for a guilty finding on the murder charge because of her fear of her co-defendant and her prior history of abuse. The state appellate court's conclusion is consistent with the record before this court. As explained by that court, petitioner's trial counsel introduced evidence in support of his defense theory and argued that defense to the jury.

The decision of the California Court of Appeal rejecting petitioner's claim that she was denied due process and the right to present a defense because she was not granted a new trial at which she could take advantage of the decision in <u>Anderson</u> is not contrary to or an unreasonable application of federal law. Accordingly, petitioner is not entitled to relief on these claims.

C. <u>Failure to Give a Jury Instruction on Mistake of Fact</u>

In petitioner's next claim, she argues that the trial court's "refusal to give a requested defense instruction on mistake of fact (CALJIC No. 4.35), considered in light of <u>Anderson</u>, violated petitioner's rights to due process, to trial by jury and to a fair trial." (Attach. to Pet. at 5.) Petitioner explains that her trial testimony to the effect that she believed the victim

/////

19

was already dead when she stabbed her "supported allowing the jury to find that petitioner did not have the mental state necessary for murder – namely, the intent to kill the victim." (Id.)

The California Court of Appeal rejected petitioner's argument in this regard, reasoning as follows:

> On remand from the Supreme Court, Nettie requests that we reconsider her claim that the refusal to give a requested instruction on mistake of fact was error. She argues that <u>Anderson</u> contains reasoning which supports the mistake of fact instruction and that reconsideration of her instructional claim is warranted because the mistake of fact and duress instructions were closely related under the defense's theory of the case.[10] Citing California Rules of Court, rule 13(b)(2) ( rule 13), the People contend this claim is not properly before the court on remand. We agree with the People.
>
> On remand, the California Supreme Court ordered that we reconsider the cause in light of <u>Anderson</u>. Under rule 13, "[s]upplemental briefs must be limited to matters arising after the previous Court of Appeal decision in the cause, unless the presiding justice permits briefing on other matters." The presiding justice did not permit briefing on this claim. Because <u>Anderson</u> did not alter the law governing the defense of mistake of fact, it has no affect on our prior analysis or conclusion. We therefore decline to reconsider our decision on this claim. Accordingly, we resolve her claim as originally presented.

/////

/////

---

[10] Nettie bases her argument on the fact that <u>Anderson</u> did not disturb the use of duress as a defense to charges other than murder, i.e. mutilating a corpse. (Health & Saf. Code, § 7052.) However, defendant was not charged with mutilating a corpse nor did the prosecution rely on that offense as a legal basis for the lesser included charge of involuntary manslaughter. It was the defense who urged the jury to find that Nettie committed a lesser and non-homicide offense. Defense counsel argued that if the jury found defendant stabbed the victim, believing she was already dead, the offense would be assault with a deadly weapon rather than murder, and the jury was instructed on the elements of that offense. Under those circumstances, assault with a deadly weapon might also provide the basis for a conviction of involuntary manslaughter. (See <u>People v. Cameron</u> (1994) 30 Cal.App.4th 591 [killing in commission of dangerous felony without malice or intent].) Duress continues to be a viable defense to the crime of assault. However, the jury clearly rejected the factual basis for that legal theory. Having convicted Nettie of second degree murder, the jury rejected her testimony that she stabbed the victim believing she was already dead. Thus, any failure to give a mistake of fact instruction was harmless. (See <u>People v. Beardslee</u>, <u>supra</u>, 53 Cal.3d at p. 87.)

As originally raised, Nettie contends the trial court erred in failing to give her requested instruction on mistake of fact, CALJIC No. 4.35.[11]

She argues she was entitled to the instruction under section 26, subdivision Three,[12] because at the time her codefendant told her to stab Dixon she believed she was already dead. The People reply that the instruction is unwarranted because she had no basis for believing that Dixon was dead. We find that Nettie's argument is unpersuasive and the contention of error is not meritorious.

She asserts it is impossible to intend to kill a dead body. (See, e.g., People v. Carpenter (1997) 15 Cal.4th 312, 391.) This claim might apply if the instruction requested pinpointed the effect of a belief that Dixon was dead on the elements of express malice or intent to kill. However, if applicable, an instruction on mistake of fact under section 26 does not merely defease the elements of malice or intent. It provides a complete defense to murder because if the asserted belief were true and reasonable, the act would be lawful.

However, Nettie's claim of belief, if true, would not render her conduct lawful. If she actually and reasonably believed Dixon was dead when stabbed, her conduct would remain unlawful under theories of vicarious liability or for negligent or reckless causation of death. Moreover, mutilating a dead body is a felony. (See Health & Saf. Code, § 7052.)

Accordingly, the requested instruction on mistake of fact defense was unwarranted on the justification tendered.

(Opinion at 23-26.)

The California Court of Appeal rejected this jury instruction claim, raised by petitioner in the instant petition, on the procedural ground that the issue was not properly before

---

[11] Nettie's requested instruction is as follows. "An act committed or an omission made in ignorance or by reason of a mistake of fact which disproves any criminal intent is not a crime. [¶] Thus a person is not guilty of a crime if she commits an act or omits to act under an actual [and reasonable] belief in the existence of certain facts and circumstances which, if true, would make the act or omission lawful."

[12] "All persons are capable of committing crimes except those belonging to the following classes:

".  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Three -  Persons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent."

the state appellate court on remand. Petitioner subsequently filed a petition for review in the California Supreme Court, raising the same claim. (Lodged Doc. 30 at 17.) That petition was summarily denied. (Lodged Doc. 31.) Accordingly, the decision of the California Court of Appeal provides the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002) (citing Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991). Because the California Court of Appeal rejected petitioner's claim on procedural grounds, and did not reach the merits, this court will review the claim de novo. Nulph, 333 F.3d at 1056.

After an independent review of the record, this court concludes that, under the circumstances of this case and taking into consideration the Anderson decision, the trial court's failure to give a jury instruction on mistake of fact did not render petitioner's trial fundamentally unfair. As explained by the California Court of Appeal, the requested instruction was not appropriate "on the justification tendered" by petitioner's trial counsel. In any event, any error by the trial court in rejecting the requested instruction was harmless because the verdict made it clear that the jury rejected petitioner's testimony that she believed the victim was already dead when she stabbed her. Accordingly, petitioner is not entitled to relief on this claim.

D. Admissibility of Petitioner's Confession

Petitioner's final claim is that the introduction into evidence at trial of her statements to police violated her federal constitutional rights because the statements were obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966) and were coerced. (Attach. to Pet. at 5.) She explains:

> On October 16, petitioner was interviewed for 6 hours while in police custody. At the time of the interview she was sluggish and medicated with pills for a bad back. Although she was advised per Miranda at the beginning of the interrogation, she did not make an explicit waiver and after one half hour, she requested to stop the interrogation and request was ignored. The officers told petitioner that if she did not talk to them they would bring her family into custody and interrogate them while petitioner sat in jail. Petitioner told the officers about her medication and began to fall asleep. However, the interrogation continued for another four and a half hours. The refusal to honor two explicit requests to cut off

22

questioning, petitioner's physical condition and the threats of
officers to arrest her family if she refused to cooperate contributed
to coercion and explicitly violated the mandates of <u>Miranda</u>. Her
confession should not have been admitted at trial for any purpose.

(<u>Id.</u>)

The California Court of Appeal rejected petitioner's argument that her statements

were improperly introduced into evidence, reasoning as follows:

> Nettie contends the trial court erred prejudicially in denying her
> motion for suppression of her extra-judicial confession for
> violation of the <u>Miranda</u>[13] rule or because the statement was
> involuntary.
>
> She argues that because the record shows she did not explicitly
> waive her right to remain silent, told the officers she had taken
> backache pills, appeared to become sluggish as the interview
> proceeded, and twice asked to continue the interview until the next
> day, the trial court was compelled to find her <u>Miranda</u> rights were
> violated and the confession thereby rendered involuntary. The
> argument is unpersuasive and the contention of error has no
> merit.[14]
>
> > "'It is the function of the trial judge to determine
> > whether the defendant did in fact knowingly and
> > voluntarily waive his right to remain silent and his

---

[13] <u>Miranda v. Arizona</u> (1966) 384 U.S. 436 [16 L.Ed.2d 694].

[14] The People submit the contention should be summarily rejected
because the record does not contain the tape of the interview and
the claim is predicated entirely upon her counsel's remarks made in
the hearing on the motion. She replies she will provide the tape as
an exhibit under California Rules of Court, rule 10(d), when
notified the case has been set for hearing.

The use of that procedure is inappropriate in these circumstances.
The claims cannot be evaluated without reviewing the tape.
Hence, the failure to specify the exhibit as a part of the clerk's
transcript under California Rules of Court, rule 5, renders it
impossible for defendant to comply with rule 15, which requires a
reference to the record.

Nonetheless, since this is an appeal in a criminal proceeding we
have augmented the record and reviewed the tape on our own
motion.

right to have the assistance of counsel.  This determination is to be made based on the totality of the circumstances surrounding the interrogation . . . .  The assertion of privilege or its waiver constitutes a question of fact which can only be decided after taking into account the special circumstances of each case . . . .  Where the evidence is in conflict, the trial court's findings in this regard will be accepted by the appellate court unless it is palpably erroneous or entirely unworthy of belief . . . .'  (People v. Bestelmeyer (1985) 166 Cal.App.3d 520, 526 [212 Cal.Rptr. 605], citations omitted: People v. Siripongs (1988) 45 Cal.3d 548, 575 [247 Cal.Rptr. 729, 754 P.2d 1306]; People v. Boyer (1989) 48 Cal.3d 247, 263 [256 Cal.Rptr. 96, 768 P.2d 610]; People v. Kelly (1990) 51 Cal.3d 931, 950 [275 Cal.Rptr. 160, 800 P.2d 516].)  ""[T]he trial court's ruling on a Miranda [ ] issue may not be set aside by us unless it is "palpably erroneous.""''  (People v. Siripongs, supra, 45 Cal.3d 548, 575, italics omitted.)"  (People v. Bolden (1996) 44 Cal.App.4th 707, 713.)

Nettie argues her confession was obtained in violation of her rights under Miranda because she invoked her right to remain silent when she asked to adjourn the interrogation until the next day.

At the outset of the interrogation she expressly acknowledged understanding the Miranda admonition.  She then participated in a protracted interrogation in which she appears alert, articulate, and facile.  After the detectives rejected her denial of involvement and persistently pressed her to tell the truth and to spare her aunt and mother the unpleasantness of an imminent interrogation, she appeared distressed.  Finally, she asked: "would there be any way that I could come back here tomorrow?  Because I took some back pain pills."  The interrogator expressed sympathy for her but told her they were unwilling to put the matter off.  She submitted she would be "more than willing to come back here and talk to you" in the morning and suggested they could pick her up.  The interrogators told her today is the day and suggested that she had a limited opportunity to tell the truth.  She then continued with the questioning and began to relate incriminating details.

The People suggest the trial court could properly find she did not invocate her right to remain silent. We agree that such a determination is within the purview of the trial court.  As the People note, the circumstances are analogous to Bolden, supra, 44 Cal.App.4th at page 713, where the question: "Can I talk to you later?" was held not to be invocation of the right to silence.

/////

Nettie also claims her confession should not have been admitted because it was involuntary.

"Involuntary" is a term of art.

> "The application of the axiom that involuntary confessions are not admissible is not always a simple matter; the concept of voluntariness is multifaceted and has been described as a 'potential morass.' (People v. Disbrow (1976) 16 Cal.3d 101, 112, fn. 12 [127 Cal.Rptr. 360, 545 P.2d 272]; also see, e.g., 1 LaFave & Israel, Criminal Procedure (1984) § 6.2, p. 442, listing derogatory commentary concerning the term 'voluntary' in this connection.) '[A] complex of values underlies the stricture against use by the state of confessions which, by way of convenient shorthand, this Court terms involuntary, and the role played by each in any situation varies according to the particular circumstances of the case.' (Blackburn v. Alabama (1960) 361 U.S. 199, 207 [4 L.Ed.2d 242, 248, 80 S.Ct. 274].)

> "The reason for excluding involuntary confessions is to provide the accused with an 'essentially free and unconstrained choice' whether to confess (Schneckloth v. Bustamonte (1973) 412 U.S. 218, 225-226 [36 L.Ed.2d 854, 93 S.Ct. 2041] ); that is to say, free of police conduct which is overreaching (see Colorado v. Connelly (1986) 479 U.S. 157, 163-164 [93 L.Ed.2d 473, 482, 107 S.Ct. 515] ). Many factors bear on the question. 'In determining whether a defendant's will was overborne in a particular case, the [United States Supreme Court] has assessed the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation.' (Schneckloth v. Bustamonte, supra, 412 U.S. at pp. 225-226 [36 L.Ed.2d at p. 862] .)

> "The criteria which measure an involuntary confession must be discerned in the case law." (Peo. v. Cahill (1994) 22 Cal.App.4th 296, 310-311, fn. omitted.)

The only criterion Nettie advances for the claim the police engaged in overreaching is a violation of the Miranda strictures. As we have rejected that claim, her argument collapses.

Having reviewed the tape, we discern no overreaching police conduct and no reason to overturn the trial court's determination

the confession was voluntary.  Notably lacking in the defendant's
showing is a development of or corroboration of her claim to have
taken pain pills for her back.

The contention the trial court erred in denying her motion to
suppress evidence of the interrogation is without merit.

(Opinion at 26-30.)

The trial court also reviewed the videotape of petitioner's confession in

addressing a defense pretrial motion to suppress and found that petitioner's statements were

neither coerced nor obtained in violation of Miranda.  (RT at 2-3, 19-20.)  The trial judge

explained his ruling in denying the motion as follows:

The court finds that was a knowing and intelligent waiver of
Miranda rights, that there was no coercion on the part of the police
that would render her statement an involuntary or coerced
statement under the totality of the circumstances.

I did note at times during the interview she was crying.  However,
there was ample opportunity for her to take breaks, for her to have
water, and I really don't feel there was any overbearing or
overreaching or any type of intimidation to this witness other than
the officers trying to seek the truth.

Both motions are denied in their totality, that is to say, the Miranda
and the question of the statement not being a voluntary statement
or being an involuntary statement.  That motion is denied.

(Id. at 19-20.)

1.  Miranda

Petitioner first claims that her statements to police in the course of the

interrogation on October 16, 1996 were obtained in violation of Miranda and should have been

excluded from evidence at her trial.  In Miranda, the United States Supreme Court held that

"[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from

custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards

effective to secure the privilege against self-incrimination."  384 U.S. at 444.  To this end,

custodial interrogation must be preceded by advice to the potential defendant that he or she has

the right to consult with a lawyer, the right to remain silent and that anything stated can be used in evidence against him or her.  Id. at 473-74.  These procedural requirements are designed "to protect people against the coercive nature of custodial interrogations."  DeWeaver v. Runnels, 556 F.3d 995, 1000 (9th Cir. 2009).  Once Miranda warnings have been given, if a suspect makes a clear and unambiguous statement invoking his constitutional rights, "all questioning must cease."  Smith v. Illinois  469 U.S. 91, 98 (1984).  See also Miranda, 384 U.S. at 473-74; Michigan v. Mosley, 423 U.S. 96, 100 (1975); DeWeaver v. Runnels, 556 F.3d at 1001.

Petitioner argues that her statements were obtained in violation of Miranda because she did not make an explicit waiver of her right to remain silent and because the interrogating officers refused to honor her requests to terminate the interview.  She contends that she invoked her right to remain silent twice: first when she asked the detectives whether she could come back the next day and, later in the interrogation, when she stated that she did not want to repeat her story again.  (Attach. to Pet. at 5.)

This court agrees with the California Court of Appeal that petitioner made an implied waiver of her right to remain silent when she voluntarily answered the detectives' questions after being advised of and acknowledging an understanding of her rights as articulated in the Miranda warning.  An express waiver of Miranda rights is not necessary.  North Carolina v. Butler, 441 U.S. 369, 373 (1979); United States v. Younger, 398 F.3d 1179, 1185 (9th Cir. 2005) ("In soliciting a waiver of Miranda rights, police officers need not use a waiver form nor ask explicitly whether a defendant intends to waive his or her rights").  A valid waiver of rights may be implied under the circumstances.  Specifically, "a suspect may impliedly waive the rights by answering an officer's questions after receiving Miranda warnings."  United States v. Rodriguez, 518 F.3d 1072, 1080 (9th Cir. 2008) (quoting United States v. Rodriguez-Preciado, 399 F.3d 1118, 1127, amended, 416 F.3d 939 (9th Cir. 2005.))  See also North Carolina v. Butler, 441 U.S. 369-73 (1979) (Waiver can be inferred "from the actions and words of the person interrogated."); Bui v. Dipaolo, 170 F.3d 232, 240 (1st Cir. 1999).  Under the

circumstances presented here, petitioner waived her <u>Miranda</u> rights at the commencement of the interrogation when, after receiving the appropriate warnings, she stated that she understood her rights and began to answer the officers' questions.

The next question is whether petitioner invoked her right to silence subsequent to her waiver. Because petitioner's alleged invocations in this regard occurred after she had already waived her constitutional rights and proceeded with the interrogation, petitioner "bears the 'burden' of cutting off questioning by unambiguously retracting the clear waiver [s]he has already given." <u>Rodriguez</u>, 518 F.3d at 1079. Invocation of the right to remain silent must be construed liberally. <u>See</u> <u>Hoffman v. United States</u>, 341 U.S. 479, 486 (1951). Thus, a suspect need not rely on any special combination of words to invoke the right to silence. <u>Quinn v. United States</u>, 349 U.S. 155, 162 (1955). <u>See</u> <u>also</u> <u>Miranda</u>, 384 U.S. at 473-74 (a suspect's assertion of the right to remain silent "in any manner" compels the police to cease questioning). In order to determine whether a suspect invoked his Fifth Amendment rights, "a court should examine the entire context in which the claimant spoke." <u>Bradley v. Meachum</u>, 918 F.2d 338, 342 (2d Cir. 1990) (quoting <u>United States v. Goodwin</u>, 470 F.2d 893, 902 (5th Cir. 1972)).

With respect to the right to counsel, if a suspect waives his or her <u>Miranda</u> rights and proceeds with an unassisted interrogation, he or she must thereafter "unambiguously request counsel" in order to restore his or her right to have an attorney present during the interrogation. <u>Davis v. United States</u>, 512 U.S. 452, 459, 461 (1994); <u>Rodriguez</u>, 518 F.3d at 1079. This means that the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." <u>Davis</u>, 512 U.S. at 459. Where there has been only an equivocal or ambiguous assertion of the right to counsel in that context, the attending officer *may* ask questions to clarify

/////

/////

/////

28

the defendant's wishes, but is not required to do so and may simply "continue questioning until and unless the suspect clearly requests an attorney." Id. at 461.[15]

The United States Supreme Court "has not yet directly addressed ambiguous statements in the context of the right to remain silent" and has not applied the Davis standard to require an unequivocal invocation of the right to remain silent context as it has required for an invocation of the right to counsel. DeWeaver, 556 F.3d at 1000-01. See also James v. Marshall, 322 F.3d 103, 108 (1st Cir. 2003); Bui, 170 F.3d at 239. Although other circuit courts have extended the Davis standard to the invocation in the right-to-silence context, the Ninth Circuit has "declined to decide whether the Davis requirement of a clear and unequivocal invocation applies to the right to remain silent." DeWeaver, 556 F.3d at 1001. However, because the United States Supreme Court has not squarely addressed the issue, a state court decision that applies the "clear and unequivocal" standard articulated in Davis to a case involving the alleged invocation of the right to remain silence is not contrary to or an unreasonable application of federal law under the AEDPA. DeWeaver, 556 F.3d at 1002.

The California Court of Appeal concluded that in this case petitioner did not unambiguously invoke her right to remain silent when she asked whether she could come back and continue the interview the following day. (Opinion at 28.) In doing so the state appellate court analogized the situation to a California case in which the question "Can I talk to you later?" was held not to be an invocation of the right to remain silent. (Id.) Similarly, in response to a defendant's argument that he invoked his right to remain silent when he inquired, "Can we talk about it tomorrow?" the Ninth Circuit has held that the trial court "was not required to interpret [the] question as an invocation of his right to remain silent." United States v. Thierman, 678 F.2d 1331, 1335-1336 (9th Cir. 1982). Likewise, a defendant's request, "Can't we wait until

---

[15] However, if a suspect makes an ambiguous statement *prior to* waiving his Miranda rights, an officer must clarify the meaning of the statement before proceeding with the interrogation. Rodriguez, 518 F.3d 1072, 1074 (9th Cir. 2008).

tomorrow?" has been deemed an equivocal invocation of his right to cut off questioning.  Martin

v. Wainwright, 770 F.2d 918, 923 (11th Cir. 1985), modified by 781 F.2d 185 (11th Cir. 1986),

abrogation on other grounds recognized by Coleman v. Singletary, 30 F.3d 1420 (11th Cir.

1994).

             In light of the authorities cited above, the state courts in this case could reasonably

determine that petitioner's statement "Would there be any way I could come back here

tomorrow?" was ambiguous with regard to whether petitioner wished to invoke her right to

remain silent.  The same is true with respect to petitioner's later statements, approximately

halfway through the interrogation; to wit, "I . . . want to go home.  I mean, am I gonna go to jail

tonight?" and "I don't want to go through it again.  I don't know."  (Lodged Doc. 1, lodged on

March 11, 2009 (hereinafter Interrogation), at 68-69.)  None of petitioner's statements to police

rise to the level of a clear and unequivocal invocation of the right to remain silent.  See

DeWeaver, 556 F.3d at 1000-02 (state court's decision that petitioner did not invoke his right to

remain silent when he requested to go back to his jail cell and therefore no Miranda violation

occurred was not contrary to federal law).  Because petitioner did not unambiguously invoke her

right to remain silent after her waiver of that right, the decision of the California Court of Appeal

that the detectives were not required to stop the interrogation was not contrary to federal law and

should not be set aside.  Davis, 512 U.S. at 461; DeWeaver, Accordingly, petitioner is not

entitled to habeas relief with respect to her claim her confession was obtained in violation of

Miranda.

             2.  Voluntariness of Confession

             Petitioner also claims that her confession was involuntary.  In this regard,

petitioner identifies several aspects of the interrogation that she claims reflect indicia of coercion:

(1) she was interviewed for six hours; (2) she was sluggish, tired, and medicated with pain pills

during the interview; (3) her Miranda rights were violated during the interrogation; and (4) the

/////

officers threatened to bring her family "into custody" and interrogate them if she refused to talk to them.  (Attach. to Pet., at 5.)

The Constitution demands that confessions be made voluntarily.  See Lego v. Twomey, 404 U.S. 477, 483-85 (1972).  Involuntary confessions may not be used to convict criminal defendants because they are inherently untrustworthy and because society shares "the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves."  Spano v. New York, 360 U.S. 315, 320-21 (1959).  A confession is voluntary only if it is "'the product of a rational intellect and a free will.'"  Medeiros v. Shimoda, 889 F.2d 819, 823 (9th Cir. 1989) (quoting Townsend v. Sain, 372 U.S. 293, 307 (1963)).  See also Blackburn v. Alabama, 361 U.S. 199, 208 (1960).  "The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession."  Collazo v. Estelle, 940 F.2d 411, 416 (9th Cir. 1991) (en banc) (quoting Culombe v. Connecticut, 367 U.S. 568, 602 (1961)).

"There is no 'talismanic definition of voluntariness' that is 'mechanically applicable.'"  Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir. 2003) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 224 (1973)).  Rather, voluntariness is to be determined in light of the totality of the circumstances.  See Miller v. Fenton, 474 U.S. 104, 112 (1985); Haynes v. Washington, 373 U.S. 503, 513 (1963); Beatty v. Stewart, 303 F.3d 975, 992 (9th Cir. 2002).  This includes consideration of both the characteristics of the petitioner and the details of the interrogation.  Schneckloth, 412 U.S. at 226.  Relevant circumstances that should be considered in determining whether a confession was voluntarily made include the following factors: (1) the youth of the accused; (2) his/her intelligence; (3) the lack of any advice to the accused of his/her constitutional rights; (4) the length of the detention; (5) the prolonged nature of the questioning; and (6) the use of any punishment such as the deprivation of food or sleep.  Id.; United States v. Haswood, 350 F.3d 1024, 1027 (9th Cir. 2003).

31

1     Officials cannot extract a confession "by any sort of threats or violence, nor . . . by

2 any direct or implied promises, however slight, nor by the exertion of any improper influence."

3 Hutto v. Ross, 429 U.S. 38, 30 (1976) (quoting Bram v. United States, 168 U.S. 532, 542-43

4 (1897)). Therefore, in Lynumn v. Illinois, 372 U.S. 528, 534 (1963), a confession was found to

5 be coerced by officers' false statements that state financial aid for defendant's infant children

6 would be cut off, and her children taken from her, if she did not cooperate. In Rogers v.

7 Richmond, 365 U.S. 534, 541-45 (1961), the defendant's confession was found to be coerced

8 when it was obtained in response to a police threat to take defendant's wife, who suffered from

9 arthritis, into custody. In Spano, 360 U.S. at 323, a confession found to be coerced where police

10 instructed a friend of the accused to falsely state that petitioner's telephone call had gotten him

11 into trouble, that his job was in jeopardy and that loss of his job would be disastrous to his three

12 children, his wife and his unborn child. See also Miranda, 384 U.S. at 476 ("any evidence that

13 the accused was threatened, tricked, or cajoled into a waiver [of Fifth Amendment right to remain

14 silent] will, of course, show that the defendant did not voluntarily waive his privilege"). Neither

15 physical intimidation nor psychological pressure is permissible. Haswood, 350 F.3d at 1027 ("A

16 confession is involuntary if coerced either by physical intimidation or psychological pressure.");

17 United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir. 1981) ("subtle psychological coercion

18 suffices . . . at times more effectively 'to overbear a rational intellect and a free will'"). On the

19 other hand, "if interrogators obtained a confession after Miranda warnings and a valid waiver, the

20 confession was likely voluntary." DeWeaver, 556 F.3d at 1003.

21     This court has reviewed the videotape of the interrogation at issue and concludes

22 that petitioner's claim that her confession was involuntary should be rejected.[16] Petitioner's

23 _____

24     [16] By order dated January 28, 2009, this court directed respondent to augment the record
in this case with the videotape of petitioner's statements to police on October 16, 1996, and any
25 written transcription thereof. In response to the court's order, respondent lodged a compact disc
containing the interrogation at issue and a transcription thereof. This information has been
26 reviewed by the court in connection with petitioner's challenge to the admission into evidence of
her statements to police.

statements, as viewed on the videotape, appear to have been "the product of a rational intellect and a free will." <u>Townsend</u>, 372 U.S. at 307. <u>See</u> also <u>Blackburn v. Alabama</u>, 361 U.S. 199, 208 (1960). Petitioner was not a juvenile and she appeared on the videotape to be intelligent and articulate. She was advised of her <u>Miranda</u> rights at the beginning of the interrogation. Although the entire detention period was approximately six hours in length, the detectives took several breaks, including one in which petitioner was allowed to sleep for at least two hours. Petitioner was not deprived of any food or water, and she was not promised leniency in exchange for a confession. She was not shackled, handcuffed, or otherwise restrained. The officers were polite throughout the questioning and did not raise their voices. Petitioner apparently had some experience with the police department, because she admitted that her fingerprints were on file. (Interrogation at 11.) Petitioner was very alert at the beginning of the interrogation but became less animated as the process went on, eventually putting her head down on the table in front of her and refusing to look at the interrogating deputies. Although petitioner attributes her behavior in this regard to pain medication, the state appellate court observed that "notably lacking in the defendant's showing is a development of or corroboration of her claim to have taken pain pills for her back." (Opinion at 30.) It appeared to the undersigned that petitioner was simply did not want to look at the deputies while the questioning was going on, most likely because she was embarrassed to be discussing her part in the murder of Dixon. Petitioner did not appear to be unable to focus or concentrate, despite her apparent fatigue, and there is no evidence she was disoriented or unusually susceptible to police pressure. Further, as discussed above, this court has concluded that there was no violation of <u>Miranda</u> during the interrogation.[17]

/////

---

[17] If the detectives had violated <u>Miranda</u>, this would affect whether petitioner's confession was voluntary. <u>See</u> <u>Clewis v. Texas</u>, 386 U.S. 707, 709 (1967) (<u>Miranda</u> violations are relevant on the issue of the voluntariness of a confession); <u>Collazo</u>, 940 F.2d at 418 ("a breach of [<u>Miranda</u>] rules not only has <u>Miranda</u> implications, but traditional voluntariness implications as well" because a failure to comply with <u>Miranda</u> aggravates coercive tactics).

The detectives who interrogated petitioner told her they thought she was involved

in the murder and stated that if she failed to explain her involvement they would have to bring

her mother and aunt to the police station and ask them what petitioner had told them about the

murder.  (Interrogation at 13, 18, 20.)  They asked petitioner whether she wanted to put her

family through that ordeal.  (Id. at 21.)  One detective told petitioner he would "have to drag

[them] down here and try to get it out of them," that he would "have to interrogate them until I

get it out of them," and that her family would "feel bad" if they had to implicate her.  (Id. at 21,

23.)  Immediately after the detective made these statements, petitioner asked whether she could

come back for questioning the next day.  In response to petitioner's query, she was told that "we

can't put this off," that "tomorrow is not gonna make any difference," and that "today is the day

to tell the truth."  (Interrogation at 23-24.)  In context, petitioner was told that if she refused to

continue with the interrogation, her relatives would be questioned by police.

As noted above, threats against a suspect's family members can render a

confession involuntary.  As explained by one court:

> The tactic of inducing a suspect to talk by threatening adverse
> consequences to a friend or loved one is a particularly pernicious
> technique.  In Lynumn v. Illinois, 372 U.S. 528, 534, 83 S.Ct. 917,
> 9 L.Ed.2d 922 (1963), the Supreme Court held that when police
> told a defendant that if she did not talk her children would be taken
> away and state financial assistance to them would be cut off her
> statement was involuntary.  In Spano, 360 U.S. at 323, 79 S.Ct.
> 1202, the Court found a confession involuntary when a police
> trainee, who was a childhood friend of the defendant, told the
> defendant that he could lose his job and his family would suffer
> unless defendant confessed.  See also Rogers, 365 U.S. at 535-36,
> 81 S.Ct. 735 (discussing police threat to take defendant's wife, who
> suffered from arthritis, into custody).
>
> A strong argument can be made that falsely informing a suspect
> that his failure to confess will cause a friend or loved one to suffer
> serious adverse consequences has a substantial potential for
> precipitating a false confession and should be prohibited.  See
> Interrogation, supra, at 1241.  A suspect confronted with such a
> misrepresentation might easily be led to believe that protecting a
> friend or loved one from imminent harm was more important than
> protecting himself from the consequences of a confession.
> However, a police officer's suggestion of possible adverse

consequences to a suspect's friend or loved one is not always improper. Sometimes such a suggestion may be an honest statement of a possible outcome. If, for example, police find drugs in a common area of a home shared by a husband and wife, and, in the absence of an admission from one spouse, could properly seek charges against both, it would be entirely proper for police to disclose this information during an interrogation.

Thus, when considering whether threats of adverse consequences to a suspect's friend or loved one constitute unconstitutional police coercion, a variety of factors are likely to be relevant: (1) whether the officers actually intended to take action against the friend or loved one or whether the threat constituted a misrepresentation; (2) whether there was a legitimate basis for taking action against the friend or loved one; (3) the severity of the threatened action; and (4) whether the friend or loved one suffered from an infirmity that would render him or her particularly vulnerable to official action.

United States v. Rodgers, 186 F. Supp.2d 971, 976 (E.D. Wis. 2002).

This court concludes that the detectives' statements about bringing petitioner's mother and aunt to the station to be questioned, although hard-hitting, did not rise to the level of an improper threat that would render petitioner's confession involuntary. In United States v. McShane, 462 F.2d 5, 6 (9th Cir. 1972), the Ninth Circuit concluded that the police did not coerce the defendant's confession when they took his girlfriend to the station for questioning. See also Vogt v. United States, 156 F.2d 308, 312 (5th Cir. 1946) (a confession was deemed to be voluntary where the officers told an accused man they were going to bring his wife to the jail for questioning because "[t]he fact that an accused undertakes to shoulder the entire burden in order to exculpate someone else does not, of itself, render his confession involuntary and invalid.") Here, the police did not threaten any of petitioner's family members with arrest, nor did they actually bring anyone to the police station prior to making their statements to petitioner. Although the statements made by the detective were admittedly heavy-handed, they do not appear to the court to be so harsh that they would have caused petitioner to lose self-direction. Rather, the police merely informed petitioner of the consequences of a decision not to continue with the interrogation: her relatives would have to be questioned because the police knew they had information about petitioner's role in the crime under investigation. The statements were a

35

fair prediction of the likely consequences of petitioner's failure to cooperate, since it appears that petitioner's mother had turned her in to the police. Under these circumstances, it would have been reasonable for the authorities to question the mother and petitioner's other relatives to obtain whatever other information they might have had relevant to the investigation.

After a review of the entire interrogation, this court concludes that petitioner's statements were not involuntarily made. Considering the entire record, petitioner's statements appeared to be "the product of a rational intellect and a free will." Townsend, 372 U.S. at 307. The state appellate court's decision that petitioner's confession was voluntary was not contrary to federal precedent or an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2). Accordingly, petitioner is not entitled to relief on her claim that here statements were involuntary.

### 3. Admission of Confession for Impeachment Purposes

Respondents argue that even if petitioner's confession was obtained in violation of Miranda, it was properly admitted into evidence at her trial because it was voluntary and was used only to impeach her testimony. (Answer at 21.)

A voluntary statement taken in violation of Miranda may be introduced at a federal criminal trial for impeachment purposes. Harris v. New York, 401 U.S. 222, 226 (1971); Doody v. Schriro, 548 F.3d 847, 860 n.13 (9th Cir. 2008). Cf. Henry v. Kernan, 197 F.3d 1021, 1024 (9th Cir. 1999) (trial court erred in admitting post-Miranda statements under guise of impeachment when the sheriff's officers "set out in a deliberate course of action to violate Miranda," and the primary use of the statements was to establish an essential element of the crime charged). On the other hand, involuntary statements are excluded for all purposes. Pollard v. Galaza, 290 F.3d 1030, 1033 (9th Cir. 2002).

A review of the record reflects that evidence of petitioner's confession was introduced during the prosecutor's cross-examination of petitioner and during the defense case of her co-defendant and husband, Travis Reay, when he called one of the interrogating detectives

(Detective Minter) as a witness.  (RT at 759-63, 776-86, 789-811, 820-27, 1197, 1202-22.)[18]
After Detective Minter had concluded her testimony, the prosecutor and petitioner's counsel
stipulated that if she were recalled, Detective Minter would testify that petitioner made certain
statements during her interrogation regarding why she stabbed the victim and whether Travis
Reay stabbed the victim.  (Id. at 1255-57.)  Finally, the prosecutor referred to petitioner's
interrogation and confession fairly extensively during his closing argument, in an attempt to
convince the jury that petitioner had more involvement in the murder than she described in her
trial testimony.  (Id. at 1291-98.)

In her opening brief on appeal, petitioner argued that her statements to police were
involuntarily made and were therefore inadmissible at trial for all purposes.  (Lodged Doc. 23 at
67.)  In the alternative, she argued that assuming the statements were properly admitted for
impeachment purposes, the trial court should have instructed the jury pursuant to CALJIC No.
2.13.1 that the statements were relevant only to her credibility and not as substantive proof of her
guilt.  (Id.)  Petitioner also argued that her statements to police were used by the prosecutor in his
closing argument to demonstrate her guilt, even though they were ostensibly admitted under the
guise of impeachment.  (Id. at 70, 78-80.)  In his reply brief on appeal, respondent argued as
argued here, that petitioner's voluntary confession was properly admitted as impeachment
evidence, even if it was obtained in violation of Miranda.  (Lodged Doc. 2, lodged in Travis Reay
habeas, at 66.)  The California Court of Appeal did not address this issue, finding instead that no
Miranda violation occurred during petitioner's interrogation and that her confession was
voluntary.  (Opinion at 26-30.)

It is true that petitioner's statements to police were not introduced in the
prosecution's case-in-chief.  However, their admission was not strictly limited to purposes of

_____

[18]  Although petitioner had previously filed an unsuccessful motion to suppress her
confession, her trial counsel did not raise any objection when Detective Minter was called to the
witness stand.  (Id. at 1196-97.)

37

1  impeachment either.  As described above, petitioner's statements were used by the prosecution

2  at least in part, to bolster the prosecution theory that petitioner committed premeditated murder.

3  In any event, because this court has concluded that petitioner's constitutional rights were not

4  violated during her interrogation, her statements were properly admitted both as substantive

5  evidence against petitioner and also to impeach her testimony.

6                                                    CONCLUSION

7              Accordingly, for all of the foregoing reasons, IT IS HEREBY RECOMMENDED

8  that petitioner's application for a writ of habeas corpus be denied.

9              These findings and recommendations are submitted to the United States District

10  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

11  days after being served with these findings and recommendations, any party may file written

12  objections with the court and serve a copy on all parties.  Such a document should be captioned

13  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

14  shall be served and filed within ten days after service of the objections.  The parties are advised

15  that failure to file objections within the specified time may waive the right to appeal the District

16  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

17  DATED: May 22, 2009.

18

19                                                    _____

20                                                    DALE A. DROZD
                                                     UNITED STATES MAGISTRATE JUDGE

21  DAD:8
     reay356.hc

22

23

24

25

26